UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

    v.

<u>Jared Stottlar</u>

Criminal No. 20-cr-061-LM
Opinion No. 2025 DNH 012 P

**O R D E R**

The defendant, Jared Stottlar, moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). See doc. no. 141. He contends that his medical circumstances and his rehabilitative efforts demonstrate an extraordinary and compelling reason for a sentence reduction. The government objects. See doc. no. 146. The court held an evidentiary hearing on Stottlar's motion, at which Stottlar testified. For the following reasons, Stottlar's motion for compassionate release (doc. no. 141) is denied without prejudice.

**STANDARD OF REVIEW**

A court may grant a sentence reduction, otherwise known as "compassionate release," under 18 U.S.C. § 3582(c)(1)(A). That statute provides in relevant part:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in

> section 3553(a) to the extent that they are applicable, if it finds that—
>
>> (i) extraordinary and compelling reasons warrant such a reduction; . . .
>
>> . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

A prisoner seeking compassionate release under this statute must make three showings. First, he must show that he has either exhausted administrative remedies within the Bureau of Prisons ("BOP") or that at least thirty days has passed since BOP received his request to seek a sentence reduction. Id.; accord United States v. Feliz, 565 F. Supp. 3d 118, 120 (D.N.H. 2021). Second, he must show that there are "extraordinary and compelling reasons" for a sentence reduction that are "consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A); accord United States v. Ruvalcaba, 26 F.4th 14, 18-19 (1st Cir. 2022). Third, he must show that a sentence reduction is consistent with the sentencing factors in 18 U.S.C. § 3553(a) "to the extent that they are applicable." § 3582(c)(1)(A); accord United States v. Texeira-Nieves, 23 F.4th 48, 54 (1st Cir. 2022). Where the applicable sentencing factors cut against release and outweigh the defendant's showing on the extraordinary-and-compelling prong, a sentence reduction is not warranted. See United States v. Hilow, 561 F. Supp. 3d 151, 153 (D.N.H. 2021). "[D]istrict courts possess significant discretion in evaluating motions for compassionate release." Texeira-Nieves, 23 F.4th at 55.

# BACKGROUND

I.  Factual Background

The following facts are drawn from the factual summary set forth in the presence report (doc. no. 120). Neither party objected to the facts as set forth in the presence report at the sentencing hearing, and the court accordingly adopted the facts as set forth therein.

A.  Traffic Stop #1 (August 8, 2019)

The Tilton, New Hampshire, Police Department ("Tilton PD") began investigating Stottlar for methamphetamine trafficking in August 2018. Around that time, officers received information from a cooperating individual that the individual had purchased large quantities of methamphetamine from Stottlar on several occasions. In addition, Stottlar's neighbors reported to the police that there had been constant traffic in and out of Stottlar's apartment in Tilton. Tilton PD's own surveillance confirmed that Stottlar had an unusually large number of visitors at his apartment. Tilton PD subsequently received information that Stottlar was supplying methamphetamine to an individual named Katelyn McCormick, who was known to be involved in distributing large quantities of the drug. Following an arrest of McCormick in 2019, officers conducted a forensic examination of McCormick's cell phone and confirmed that Stottlar was her supplier.

On August 8, 2019, Tilton PD conducted a motor vehicle stop of McCormick as she was leaving Stottlar's apartment. During the stop, officers recovered approximately two pounds of methamphetamine. McCormick stated that she

purchased the methamphetamine from Stottlar earlier that day, and that, during the purchase, she saw that Stottlar had an additional pound of the drug in his possession. She also stated that Stottlar was known to carry a handgun, and that he had several cameras and a large safe in his garage.

Based upon the information provided by McCormick, Tilton PD obtained a search warrant for Stottlar's residence, vehicle, and person. That same day, officers stopped Stottlar in his car as he was leaving his home. Stottlar said there was a gun in the car and agreed to let officers search him. The officers found nearly $6,000 in cash on Stottlar, which had been separated and wrapped in rubber bands. The police later searched the car pursuant to the warrant. They found over a pound of methamphetamine, $54,000 in cash, and two handguns (both of which were in the driver's side door). One of the handguns had been previously reported stolen. Officers also found scales, plastic baggies, and rubber bands.

Meanwhile, officers also searched Stottlar's residence pursuant to the warrant. In Stottlar's bedroom, they found an AR-15, a pump-action shotgun, a bolt-action rifle, and three handguns (one of which had previously been reported stolen), along with more methamphetamine and drug packaging materials. They also observed a surveillance system on the property and found a case full of what appeared to be used cell phones.

For reasons that are not apparent, Tilton PD did not seek an arrest warrant for Stottlar following execution of the warrant and permitted him to leave the scene on foot.

B.   Traffic Stop #2 (November 11, 2019)

On November 11, 2019, a Tilton PD officer stopped a pick-up truck for not having its headlights on after dark. The officer immediately recognized Stottlar (the driver) in light of Tilton PD's ongoing investigation into Stottlar's trafficking activities. The officer saw a partially opened backpack in the backseat of the truck, and was able see plastic baggies inside the backpack. When asked, Stottlar denied there were drugs in the backpack and claimed the baggies were for storing screws and nails. He did admit there was a gun in the truck, however. While being questioned, Stottlar started sweating despite the cold temperature outside.

Officers seized the truck pending issuance of a search warrant but allowed Stottlar to return home. On November 15, 2019, the officers searched the truck pursuant to a warrant. They found over two pounds of methamphetamine, a loaded handgun in the driver's side door, and over $22,000 in cash.

C.   Traffic Stop #3 (November 20, 2019)

Shortly after midnight on November 20, 2019, an officer with the Franklin, New Hampshire, Police Department stopped a car for defective headlights and for an expired registration sticker. The officer identified Stottlar as the driver. Further investigation revealed that the car's license plates were suspended. The officer told Stottlar that he could not drive the car given the aforementioned issues, but that he was free to leave. Stottlar asked if he could get a tool bag from the car. When the

5

officer went to retrieve Stottlar's bag, however, he saw a black case labeled "Dime bags" inside. The officer then told Stottlar that the tool bag needed to remain with the vehicle. Stottlar left without the bag. Officers later searched the black case pursuant to the department's inventory search policy. The search revealed approximately thirty-eight grams of methamphetamine, along with a scale and a pipe.

The officers obtained an arrest warrant for Stottlar based on what they found in the car. They travelled to his residence on November 21, 2019, to execute that arrest warrant as well as a search warrant related to a child pornography investigation involving Stottlar's cousin, who lived there too. The officers located Stottlar upon their arrival and arrested him. When they began searching the home pursuant to the child pornography warrant, however, they immediately discovered multiple firearms, a blow torch, and a large glass smoking device. In addition, a drug-sniffing dog alerted to the presence of narcotics in Stottlar's car, which was parked in the driveway. The officers stopped their search to seek an additional search warrant for drug-related items, which was granted. They found $14,450 in cash inside Stottlar's car. Inside the residence, they found two firearms, scales, drug packaging items, drug ledgers, and pills. Meanwhile, officers transported Stottlar to the Merrimack County House of Corrections. Jail officials searched Stottlar's person and discovered methamphetamine in his pants pocket.

D.     Traffic Stop #4 (December 9, 2019)

On December 9, 2019, an officer with Tilton PD saw Stottlar driving a car.[1] The officer was aware of an outstanding state court warrant for Stottlar's arrest. The officer stopped the car and arrested Stottlar. A search of his person incident to arrest revealed approximately $6,700 in cash. A search of Stottlar's car revealed approximately forty-five grams of methamphetamine.

Following his arrest, Stottlar waived his Miranda rights and spoke with the police. Stottlar admitted to purchasing large quantities of methamphetamine from a supplier utilizing a storage unit facility in Belmont, New Hampshire. He said that he typically purchased between one and five pounds of methamphetamine at a time, but that he had purchased as much as ten pounds on at least one occasion.

E.     Arrest on June 9, 2020 & Additional Statement

On June 2, 2020, the government filed a criminal complaint in this court charging Stottlar with one count of possession of methamphetamine with intent to distribute. Doc. no. 1; see 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii). Officers arrested Stottlar on June 9, 2020 pursuant to an arrest warrant issued in conjunction with this criminal complaint. Stottlar once again waived his Miranda rights and agreed to speak with officers. He admitted to distributing methamphetamine for several years, and said that he had received a shipment of twenty pounds of methamphetamine the day before the initial search of his residence on August 8, 2019. Stottlar claimed that he

---

[1] Presumably, Stottlar made bail after being arrested following the previous incident.

stopped selling methamphetamine briefly after this search, but then obtained several new supply sources and resumed selling. Stottlar has been incarcerated on this matter since his June 9, 2020 arrest.

II.  Procedural Background

On July 22, 2020, the grand jury returned a three-count indictment against Stottlar charging him with: one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii) (pertaining to Traffic Stop #1 on August 8, 2019); one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (pertaining to Traffic Stop #1); and one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii) (pertaining to Traffic Stop #4 on December 9, 2019). See doc. no. 10 (indictment).

On August 2, 2021, the grand jury returned a six-count superseding indictment charging Stottlar as follows:

- Count One: possession with intent to distribute 500 grams or more of a substance containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii) (pertaining to Traffic Stop #1 on August 8, 2019)

- Count Two: possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (pertaining to Traffic Stop #1)

- Count Three: possession with intent to distribute 500 grams or more of a substance containing

8

> methamphetamine in violation of 21 U.S.C. §§ 841(a)(1)
> and (b)(1)(A)(viii) (pertaining to Traffic Stop #2 on
> November 11, 2019)
>
> - Count Four: possession of a firearm in furtherance of a
>   drug trafficking crime in violation of 18 U.S.C. § 924(c)
>   (pertaining to Traffic Stop #2)
>
> - Count Five: possession with intent to distribute five
>   grams or more of methamphetamine in violation of 21
>   U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii) (pertaining to
>   Traffic Stop #3 on November 20, 2019)
>
> - Count Six: possession with intent to distribute five
>   grams or more of methamphetamine in violation of 21
>   U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii) (pertaining to
>   Traffic Stop #4 on December 9, 2019)

Doc. no. 57 (superseding indictment).

Stottlar faced mandatory minimum sentences of ten years on each of Counts One and Three. See 21 U.S.C. §§ 841(a)(1), (b)(1)(A). He faced mandatory minimum sentences of five years on each of Counts Five and Six. See 21 U.S.C. §§ 841(a)(1), (b)(1)(B). Finally, he faced mandatory minimum sentences of five years on each of Counts Two and Four. See 18 U.S.C. § 924(c)(1)(A). While the sentences on the drug counts (Counts One, Three, Five, and Six) could have been concurrent with each other, the sentences on the firearms counts (Counts Two and Four) would have been required to be consecutive to each other and all other sentences imposed in this matter. See 18 U.S.C. 924(c)(1)(D)(ii). Thus, if Stottlar had been convicted on all counts in the superseding indictment, he would have been sentenced to <u>at minimum</u> twenty years' imprisonment.

After substantial pretrial litigation, the parties reached a "binding" plea agreement in October 2022. See doc. nos. 101, 119;[2] Fed. R. Crim. P. 11(c)(1)(C). Under that agreement, Stottlar agreed to plead guilty to a superseding information charging him with one count of possession with intent to distribute five grams or more of methamphetamine (Count One), and one count of possession of a firearm in furtherance of a drug trafficking crime (Count Two). See doc no. 118; doc. no. 119 at 1. Stottlar was subject to a mandatory minimum sentence of sixty months' imprisonment on each count, and the sentence on Count Two was statutorily required to run consecutively to the sentence on Count One. See 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii); 18 U.S.C. §§ 924(c)(1)(A)(i), (c)(1)(D)(ii). Thus, the mandatory minimum aggregate sentence was 120 months. In their plea agreement, the parties agreed that Stottlar would be sentenced to 144 months. See doc. no. 119 at 5-6.

At the sentencing hearing on March 9, 2023, the court calculated Stottlar's advisory sentencing guidelines range to be 168 to 195 months. Thus, acceptance of the parties' agreement required a downward variance. Ultimately, the court ruled that, despite the scale of Stottlar's distribution activities and the fact that he continued such activities even after being stopped by the police on multiple occasions, acceptance of the party's plea agreement was warranted in light of

---

[2] Although the parties filed their plea agreement in this court in October 2022, the original superseding information contained a typographical error necessitating that the parties file a revised plea agreement and a second superseding information.

Stottlar's rehabilitative efforts since his incarceration and his minimal prior criminal history.

Stottlar subsequently filed the instant motion for compassionate release. At the hearing on Stottlar's motion, the parties represented to the court that Stottlar's projected release date (accounting for good-time credits) is August 27, 2030. He has served approximately 38% of his imposed sentence and approximately 45% of the time until his projected release date.

## DISCUSSION

As noted, to obtain a sentence reduction under the compassionate release statute, the defendant must: (1) exhaust administrative remedies; (2) demonstrate "extraordinary and compelling reasons" for a sentence reduction; and (3) show that a sentence reduction is consistent with applicable sentencing factors. 18 U.S.C. § 3582(c)(1)(A). The government does not dispute that Stottlar has exhausted his administrative remedies. Thus, the court considers only the second and third elements.

Stottlar contends that there are extraordinary and compelling reasons for a sentence reduction in light of his medical circumstances and his rehabilitative efforts. With respect to his medical circumstances, he submits that he was diagnosed with colon cancer after a June 2023 colonoscopy, and that he suffers from several other chronic conditions that BOP has failed to adequately treat. The court is deeply troubled by the quality of care Stottlar has received while in BOP custody as well as BOP's failure to timely communicate with Stottlar regarding his

11

conditions and treatment. For example, although the results of the June 2023 biopsy confirmed Stottlar's cancer diagnosis, BOP never informed him of this diagnosis. It was only when he was brought to an appointment with a surgeon employed by an outside provider, and the surgeon began informing Stottlar of his plan to surgically remove the cancerous portion of Stottlar's colon, that Stottlar became aware of his diagnosis. What is more, although Stottlar's colon surgery was successful and an April 2024 biopsy did not indicate the presence of cancerous cells, BOP did not inform Stottlar of the result of that biopsy either. Stottlar learned he was cancer-free for the first time when he read the government's objection to his motion for compassionate release. BOP's failure to inform Stottlar of these matters raises grave doubts as to whether BOP can provide Stottlar with basic information about his own health.[3] In the context of Stottlar's colon cancer diagnosis, a potentially deadly disease, receiving adequate communication about the progress of his condition and treatment is an important component of his medical care. In addition, BOP has failed to provide Stottlar with the treatment he needs to address several chronic conditions that cause him severe pain which BOP has known about for some time.

---

[3] The court is similarly alarmed by a recent report authored by the Department of Justice Office of the Inspector General concerning FMC Devens (the institution where Stottlar is incarcerated), which documents a healthcare worker staffing crisis at FMC Devens and lengthy delays in the provision of medical care to inmates. The report suggests that the problems Stottlar is experiencing result from systemic shortcomings at FMC Devens and are therefore more likely to recur.

Moreover, Stottlar's rehabilitation has been remarkable. He completed the Strafford County Department of Corrections' "Therapeutic Communities" program while a pretrial detainee, which is a highly reputable substance use disorder treatment program. His work at this program was so outstanding that he was permitted to remain with the program for more than a year after he completed it. The jail's Director of Programs was so taken with Stottlar's rehabilitative efforts while at Strafford County that she felt compelled to write the first letter she had ever written on behalf of an inmate. And upon his transfer to BOP custody, Stottlar began working on the Memory Disorder Unit at FMC Devens, which offers intensive care to inmates with memory disorders such as Alzheimer's disease. BOP staff describe Stottlar's work on this unit as exceptional, and it is clear he is making a positive difference.

For these reasons as well as others in the record, the court seriously contemplated the possibility of release in this case. At the same time, it is undisputed that BOP arranged for Stottlar to undergo surgery to remove the cancerous portion of his colon, that the surgery was successful, and that a follow-up colonoscopy in April 2024 revealed that Stottlar continues to be cancer-free. And, while Stottlar's rehabilitation is impressive, rehabilitation alone cannot constitute an extraordinary and compelling reason for a sentence reduction. 28 U.S.C. § 994(t). However, even assuming without deciding that Stottlar's medical circumstances and rehabilitation combine to establish extraordinary and compelling reasons for a sentence reduction, applicable sentencing factors outweigh these reasons and

13

compel denial of his motion. See Texeira-Nieves, 23 F.4th at 55 (explaining that "a supportable determination that the balance of the section 3553(a) factors weighs against a sentence reduction constitutes an independent reason to deny compassionate release"); Hilow, 561 F. Supp. 3d at 153-54 (assuming without deciding that prisoner had shown extraordinary and compelling reasons for a sentence reduction but nevertheless denying compassionate release where sentencing factors cut against release).

Applicable sentencing factors under § 3553(a) include the nature and circumstances of Stottlar's offense, his personal history and characteristics, and considerations such as promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public from further crimes, and providing Stottlar with needed care, training, and rehabilitation in the most effective way. See 18 U.S.C. § 3553(a)(1)-(2). The court's ultimate goal in balancing these factors, whether at the sentencing phase or in the compassionate release context, is "to ensure that a sentence is 'sufficient, but not greater than necessary.'" Texeira-Nieves, 23 F.4th at 56 (quoting § 3553(a)).

The conduct underlying Stottlar's convictions was alarming and dangerous. He distributed massive quantities of methamphetamine over a prolonged period. He was found to be in possession of pounds of methamphetamine on multiple occasions and confessed to receiving a shipment of twenty pounds of meth the day before officers searched his home in August 2019. Even after police raided his home, he went right back to drug dealing. Methamphetamine is a dangerous drug that

destroys communities—and Stottlar was flooding his community with it. See United States v. Corbin, No. 1:11-cr-00025-JAW, 2011 WL 5239008, at *2 (D. Me. Nov. 1, 2011) (discussing the dangers of methamphetamine). While Stottlar's trafficking activities were no doubt driven in part by his own methamphetamine addiction, his circumstances are a far cry from those of a person who transports or sells small amounts of methamphetamine only to support an addiction. Stottlar sold methamphetamine by the pound. His primary motive was profit, not to stave off withdrawals.

Stottlar not only dealt drugs on a massive scale, but he was also armed while doing so. The initial search of his home in August 2019 revealed six firearms, including an AR-15, a pump-action shotgun, a bolt-action rifle, and three handguns—one of which was stolen. When officers stopped and searched Stottlar's car as he was leaving his home that day, they found two more handguns in the driver's side door of the vehicle—one of which was stolen. He had yet another loaded handgun in the driver's side door of his car when stopped in November 2019. And a further search of his home a little over a week later revealed two more firearms. He was caught with eleven guns in three months. As this court has previously observed, "illegal guns and drugs are as serious a combination of crimes as it gets." Feliz, 565 F. Supp. 3d at 122 (brackets omitted). Indeed, "[t]his dangerous connection between illegal drugs and firearms is well-known and has been recognized by Congress" in the enactment of the firearms charge to which Stottlar

pled guilty. United States v. Levasseur, No. 1:22-cr-00155-LEW, 2023 WL 6623165, at *9 (D. Me. Oct. 11, 2023) (citing 18 U.S.C. § 924(c)(1)(A)).

To be sure, not all of the § 3553(a) factors weigh against a sentence reduction. The court has already noted its grave concerns as to whether BOP is providing Stottlar with adequate care—let alone "the most effective" care. § 3553(a)(2)(D). Moreover, Stottlar lacked a serious record before his convictions for the instant offenses, and given his substantial rehabilitation since his arrest, he is unlikely to recidivate. Indeed, BOP itself classifies Stottlar as having a low risk of recidivism.

Nevertheless, Stottlar has not served half of his sentence, even when accounting for good-time credits. Courts generally find that granting compassionate release with such a large portion of the defendant's sentence left to be served fails to promote respect for the law, provide just punishment, or afford adequate deterrence. See, e.g., United States v. Berrios-Cruz, Crim. No. 12-0162(GMM), 2023 WL 4838152, at *5 (D.P.R. July 28, 2023). That is all the truer when, as here, "much of [the defendant's sentence] was statutorily mandated." Hilow, 561 F. Supp. 3d at 154. Though Stottlar was sentenced to 144 months of imprisonment, he was subject to a mandatory-minimum sentence of 120 months. Stottlar has not even served half of the lowest sentence authorized by law for the crimes he pled guilty to. To release him now would undermine the rule of law and create a stark sentencing disparity between Stottlar and similarly situated defendants.

Finally, in receiving a 144-month sentence, Stottlar was the beneficiary of a downward variance of 24 months. At Stottlar's sentencing, the court determined his

sentencing guidelines range to be 168 to 195 months. The court varied downward to a sentence of 144 months to honor the parties' agreement to that sentence in their plea agreement. Given that Stottlar was already the beneficiary of a reduced sentence, a further reduction at this time would be inconsistent with the goals of sentencing. See Delacruz v. United States, 471 F. Supp. 3d 451, 457 (D.N.H. 2020).

After balancing these factors, the court concludes that a sentence reduction at this time would be inconsistent with § 3553(a)'s requirement that the sentence be sufficient but not greater than necessary. However, should some substantial change in his circumstances take place, Stottlar may immediately seek the appointment of counsel and renewal of his motion for compassionate release.

## CONCLUSION

Stottlar's motion for compassionate release (doc. no. 141) is denied without prejudice.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

February 3, 2025

cc: Counsel of Record

17