UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

    v.

<u>Jared Stottlar</u>

Criminal No. 20-cr-061-LM
Opinion No. 2026 DNH 068 P

**O R D E R**

The defendant, Jared Stottlar, suffers from a complex set of medical conditions that the Bureau of Prisons ("BOP") has inadequately treated for several years. Stottlar previously filed a motion for compassionate release (doc. no. 141), which the court denied without prejudice in February 2025. Doc. no. 160. Although the court was deeply troubled by the inadequacy of Stottlar's medical care, as well as BOP's failure to communicate basic information to Stottlar about his own health, the court denied relief primarily on the grounds that Stottlar's crimes were serious and he had not yet served half of his sentence. This denial was despite the fact that, given Stottlar's remarkable rehabilitation since the time of his arrest, he is unlikely to recidivate.

Presently before the court is Stottlar's renewed motion for compassionate release. Doc. no. 174. Stottlar contends that BOP's inadequate treatment has continued (and in some ways, worsened), and that the proof of his continued rehabilitation is even stronger. The government objects. Doc. no. 175. On May 14,

2026, the court held a hearing on the renewed motion, at which Stottler testified. For the following reasons, Stottlar's motion (doc. no. 174) is granted.

## STANDARD OF REVIEW

A court may grant a sentence reduction, otherwise known as "compassionate release," under 18 U.S.C. § 3582(c)(1)(A). To obtain relief, the defendant must show "extraordinary and compelling reasons" for a sentence reduction and that a sentence reduction is consistent with the Sentencing Commission's policy statement on compassionate release. 18 U.S.C. § 3582(c)(1)(A). If the defendant makes this showing, "the district court then considers the relevant § 3553(a) sentencing factors and 'determines whether, in its discretion, the sentence reduction is warranted in whole or in part under the particular circumstances of the case.'" United States v. Burgos-Montes, 142 F.4th 48, 57 (1st Cir. 2025) (brackets and ellipsis omitted) (quoting United States v. Saccoccia, 10 F.4th 1, 4 (1st Cir. 2021)). "[D]istrict courts possess significant discretion in evaluating motions for compassionate release." United States v. Texeira-Nieves, 23 F.4th 48, 55 (1st Cir. 2022).

## BACKGROUND[1]

On June 9, 2020, Stottlar was arrested pursuant to an arrest warrant issued in conjunction with a criminal complaint filed in this court. He has been imprisoned on this matter since that date.

---

[1] The court recounted the facts of Stottlar's offenses in its previous order denying Stottlar's first motion for a sentence reduction.

After substantial pretrial litigation, the parties reached a "binding" plea agreement in October 2022. See doc. nos. 101, 119;[2] Fed. R. Crim. P. 11(c)(1)(C). Under that agreement, Stottlar agreed to plead guilty to a superseding information charging him with one count of possession with intent to distribute 5 grams or more of methamphetamine (Count One), and one count of possession of a firearm in furtherance of a drug trafficking crime (Count Two). Stottlar was subject to a mandatory minimum sentence of 60 months' imprisonment on each count, and the sentence on Count Two was statutorily required to run consecutively to the sentence on Count One. See 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii); 18 U.S.C. § 924(c)(1)(A)(i), (c)(1)(D)(ii). Thus, the mandatory minimum aggregate sentence was 120 months. In their plea agreement, the parties agreed that Stottlar would be sentenced to 144 months. See doc. no. 119 at 5-6. In March 2023, the court accepted the parties' agreement and sentenced Stottlar to 144 months' imprisonment.

Stottlar was transferred to BOP custody shortly after his sentencing hearing. He has been incarcerated at FMC Devens for the entirety of his time in BOP custody.

---

[2] Although the parties filed their plea agreement in this court in October 2022, the original superseding information contained a typographical error necessitating that the parties file a revised plea agreement and a second superseding information.

<u>Colon Cancer</u>[3]

Stottlar reported to BOP in May 2023 that he had observed blood in his feces. In June 2023, Stottlar underwent a colonoscopy. During that procedure, doctors found and removed two polyps, and arranged for them to be biopsied. The results of the biopsy revealed that Stottlar, who was 44 years old, had colon cancer.

Stottlar has a family history of colon cancer. His father was initially diagnosed with colon cancer in 2018. While he went into remission for a time, his father's cancer recurred in late 2021. He was dead within two months of the cancer's recurrence.

Although the June 2023 biopsy results showed that Stottlar had colon cancer, he did not learn of his diagnosis until July 2023 when he was brought to St. Elizabeth's Medical Center for an appointment. At St. Elizabeth's, a surgeon began telling Stottlar of his plans to remove a portion of Stottlar's colon in light of Stottlar's cancer diagnosis. Stottlar was shocked to learn he had colon cancer; BOP had not informed him of his diagnosis before his July 2023 appointment at St. Elizabeth's. In addition, neither the surgeon at St. Elizabeth's nor any medical

---

[3] The following information regarding Stottlar's medical conditions are drawn from his medical records and from Stottlar's own testimony describing his experiences at FMC Devens. The court has now heard testimony from Stottlar at two evidentiary hearings, the first occurring on May 24, 2024, and the second occurring on May 14, 2026. The government presented no witnesses at either hearing, relying only on Stottlar's medical records and cross-examinations of Stottlar. The court found Stottlar credible at both hearings.

professionals within BOP discussed treatment options with Stottlar other than surgery.

On August 10, 2023, Stottlar underwent a colectomy at St. Elizabeth's. The surgery successfully removed the portion of Stottlar's colon where the cancerous polyp had appeared. No other cancerous polyps were detected in the surgically removed portion of Stottlar's colon. Doctors recommended that Stottlar undergo a follow-up colonoscopy in a year but otherwise made no further treatment recommendations. Neither BOP nor the surgeon who performed his colectomy discussed with Stottlar what he should be doing in terms of self-care following the procedure.

Stottlar underwent that follow-up colonoscopy on April 23, 2024, at Nashoba Valley. Several samples were taken and biopsied. The biopsy did not indicate the presence of cancerous cells. No one at BOP informed Stottlar of the results of his April 2024 biopsy. He learned of the results for the first time when he read the government's objection to his first motion for compassionate release.

Stottlar received another colonoscopy in June 2025. Doctors again found and removed a polyp from Stottlar's colon and arranged for it to be biopsied. The pathology results indicated that the polyp was not cancerous and were sent to BOP within a few weeks. However, BOP did not inform Stottlar of the result of the biopsy until October 2025. The government has offered no explanation for this delay.

Testicular and Abdominal Pain

In July 2023, Stottlar reported to BOP that he was experiencing testicular pain. An ultrasound performed in August 2023 revealed that Stottlar had a cyst on his right testicle. On September 11, 2023, Stottlar reported feeling a sharp pain in his testicle that had increased over the previous twenty-four hours. BOP diagnosed him with epididymitis and prescribed antibiotics. While Stottlar reported in November 2023 that his testicular pain had subsided, it recurred in January 2024, and Stottlar notified BOP of his pain's recurrence at that time. Another ultrasound was conducted, which revealed that Stottlar had a varicocele in addition to the previously discovered testicular cyst. In addition, a urinalysis showed that Stottlar had blood in his urine.

In April 2024, Stottlar once again reported to BOP that he was continuing to experience testicular pain a few times per week. BOP medical personnel informed Stottlar that, because the second ultrasound showed that his testicular cyst had not grown, BOP did not plan to take further action regarding his ongoing testicular pain. It was only when Stottlar asked about other options that BOP agreed to send him to a urologist.

In May 2024, Stottlar met with a urologist. The urologist recommended that Stottlar receive a nerve block to treat his pain, but further recommended that Stottlar undergo surgery to repair an inguinal hernia[4] before receiving the nerve

---

[4] BOP was aware of Stottlar's hernia since at least December 2023.

block and before the urologist could determine the underlying cause of his testicular pain. BOP did not arrange for Stottlar to undergo surgery to repair his hernia until August 2025.

The hernia, left unrepaired by BOP for over eighteen months, eventually grew to the size of a grapefruit and visibly protruded from the groin area of Stottlar's clothing. He frequently needed to stop what he was doing during the day and lie down on his bed to reposition the hernia. Stottlar's testimony made clear that the pain caused by his hernia and cyst had a dramatic impact on his day-to-day life.

After BOP finally repaired Stottlar's hernia in August 2025, they arranged for Stottlar to undergo testicular surgery to address his cyst. Stottlar testified that, at a preoperative consultation in November 2025, medical professionals informed him that the surgery would be laparoscopic and minimally invasive. Stottlar underwent a surgical procedure on his testicles in December 2025, but it was far from minimally invasive. Instead, when Stottlar returned to FMC Devens after the surgery and removed his undergarments, he discovered that the surgery had involved a large scrotal incision. Stottlar credibly testified that he never gave informed consent to open surgery on his testicle.

Separately, in November 2025, Stottlar reported to BOP that he had discovered several lumps on his left testicle. An exam that month confirmed that Stottlar had two or three small nodules on the left side of his scrotum. BOP providers told Stottlar they would make a note in his file and that he should speak

with the urologist regarding treatment when he went in for his testicular surgery in December. However, when Stottlar spoke to the urologist in December, the urologist stated he had not seen a note in Stottlar's file regarding the left-side nodules and that treatment would first require an ultrasound. Although the urologist told Stottlar he would order an ultrasound, Stottlar had not received one as of May 2026.

### Bradycardia and Dizziness

Stottlar has a family history of heart issues. In 2025, BOP providers repeatedly documented that Stottlar had a resting heartrate in the forties. On May 7, 2025, BOP diagnosed Stottlar with sinus bradycardia and ordered a cardiology consultation. Later that summer, Stottlar began reporting dizziness when moving from sitting to standing.

In September 2025, a cardiologist recommended that Stottlar undergo a stress test and that he receive a Holter monitor and an echocardiogram. Stottlar underwent these tests in October 2025, but they did not reveal any issues with Stottlar's heart that could explain his persistent dizziness. Stottlar continues to experience dizziness on a regular basis, and BOP has not done anything else to diagnose its cause or abate his symptoms. According to Stottlar, BOP's advice was essentially to "brace himself" whenever he stands up.

<u>Teeth</u>

Stottlar suffers from advanced dental disease. In May 2025, a BOP dentist determined that almost all of Stottlar's teeth were decayed or fractured and recommended a full-mouth extraction and dentures. After BOP surgically removed Stottlar's teeth in June 2025, he began regularly experiencing bony particles protruding from his gums. According to Stottlar, it is very painful when the particles break through his gums and they make it difficult to eat and speak clearly. Although Stottlar has made BOP aware of these bony particles, BOP has not successfully treated them.

In addition, although BOP removed all of Stottlar's teeth in June 2025, they did not provide Stottlar with dentures until March 2026. Stottlar attempted to wear the dentures, but they were ill-fitting, painful, and seemed to cause additional bony particles to protrude from his gums. After Stottlar made BOP aware of these issues with his dentures, BOP concluded that Stottlar was suffering from a non-cancerous bone tumor in his jaw requiring surgery. As of May 2026, however, no consultation or surgery has been scheduled. In the meantime, Stottlar is unable to use his dentures without significant pain.

## DISCUSSION

To obtain relief, Stottlar must demonstrate "extraordinary and compelling reasons" for a sentence reduction and that a sentence reduction is consistent with the Sentencing Commission's policy statement on compassionate release. 18 U.S.C. § 3582(c)(1)(A). In addition, a sentence reduction must be consistent with applicable

sentencing factors under § 3553(a). The court will first address Stottlar's

justification for a sentence reduction before turning to the sentencing factors.[5]

I.      Stottlar's Complex Medical Circumstances and Remarkable Rehabilitation
        Combine to Constitute an Extraordinary and Compelling Reason For a
        Sentence Reduction

The defendant's circumstances must be "beyond the mine-run either in fact or

in degree" and present a "powerful and convincing" basis for a sentence reduction.

United States v. Canales-Ramos, 19 F.4th 561, 566-67 (1st Cir. 2021); accord

Rutherford v. United States, 608 U.S. ----, ----, 2026 WL 1485535, at *7 (2026)

("'[E]xtraordinary and compelling' reasons for compassionate release are those that

are especially unusual and convincing."). The court should undertake "a holistic

review to determine whether the [defendant's] individualized circumstances, taken

in the aggregate, present an 'extraordinary and compelling' reason to grant

compassionate release." United States v. Vega-Figueroa, 139 F.4th 77, 80-81 (1st

Cir. 2025) (quotation omitted). While "rehabilitation alone" does not suffice, "that

limitation does not stop a defendant from combining rehabilitation with other

factors to establish an extraordinary and compelling reason." United States v.

Duluc-Méndez, 156 F.4th 55, 61 (1st Cir. 2025) (quoting United States v. Sepulveda,

34 F.4th 71, 76-77 (1st Cir. 2022)). And district courts have especially wide

discretion to make "judgment calls" as to the impact of a defendant's medical

circumstances on the grounds for compassionate release. United States v. Gonzalez,

---

[5] The government does not dispute that Stottlar has adequately exhausted
administrative remedies.

68 F.4th 699, 703 (1st Cir. 2023) (brackets omitted) (quoting Canales-Ramos, 19 F.4th at 567).

In addition to showing extraordinary and compelling reasons for a sentence reduction, the defendant must demonstrate that a sentence reduction is consistent with the Sentencing Commission's policy statement on compassionate release. The policy statement identifies several medical circumstances that suffice to establish extraordinary and compelling reasons for release. See U.S.S.G. § 1B1.13(b)(1).[6] For example, extraordinary and compelling reasons exist when the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Id. § 1B1.13(b)(1)(B). Extraordinary and compelling reasons also exist when "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." Id. § 1B1.13(b)(1)(C).

However, the policy statement does not purport to limit the universe of circumstances that may constitute sufficient grounds for a sentence reduction. To the contrary, the policy statement provides that extraordinary and compelling

---

[6] In Rutherford, the Supreme Court held that the policy statement is invalid to the extent it provides that a sentencing disparity produced by a non-retroactive sentencing amendment may be considered in determining whether an extraordinary and compelling reason exists for a sentence reduction. 608 U.S. at ----, 2026 WL 1485535, at *10; see U.S.S.G. § 1B1.13(b)(6). That provision of the policy statement is not implicated by this case.

11

reasons for a sentence reduction exist when "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described [in the policy statement], are similar in gravity to those described in" the policy statement. Id. § 1B1.13(b)(5). "[R]ehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." Id. § 1B1.13(d).

Turning to the facts of this case, Stottlar contends that BOP's inadequate treatment of his complex medical circumstances combines with his rehabilitative efforts to justify a sentence reduction. The court first discusses Stottlar's medical circumstances before addressing his rehabilitation.

### A.   BOP Has Inadequately Treated Stottlar's Serious and Complicated Medical Circumstances

Stottlar was diagnosed with colon cancer in his mid-forties. His father died of colon cancer. Although all indications are that Stottlar is currently cancer free, his father's colon cancer entered remission before recurring in November 2021, and his father was dead within months of his recurrence. See United States v. Escobar-De Jesus, Crim. No. 90-130 (ADC)(HRV), 2024 WL 1230246, at *4 (D.P.R. Mar. 22, 2024) (holding that defendant's cancer, "while in remission now," weighed in favor of extraordinary and compelling reasons).

BOP has failed to communicate basic information about Stottlar's cancer. Stottlar was not aware of his cancer diagnosis until he arrived at a preoperative

consultation regarding a colectomy to remove the cancerous portion of his colon. He did not learn the result of his 2024 biopsy until he read the government's objection to his first compassionate release motion. And BOP took four months to communicate the results of Stottlar's 2025 biopsy despite having the pathology report within weeks of Stottlar's colonoscopy.[7] In the context of a serious medical condition like colon cancer, timely notice of basic information is fundamental to obtaining necessary care. BOP's failure to notify Stottlar of basic information about his cancer diagnosis weighs in favor of a sentence reduction. See United States v. Robles, No. 19cr4122, 2022 WL 229362, at *2 (S.D. Cal. Jan. 26, 2022) (failure to provide "consistent care, monitoring, and treatment required for" serious medical conditions supported sentence reduction).[8]

---

[7] Although the 2025 report did not show a recurrence of the cancer, the court is concerned (based on the totality of the record in this case) that BOP's negligence with regard to communication could morph into a delay in treatment or a failure to treat. In light of his father's rapid death following the recurrence of his cancer, Stottler is understandably concerned about the effect of any delay in treatment should he experience a recurrence.

[8] The government's argument against compassionate release focuses largely on the treatment that Stottlar has received. It is undisputed that, after Stottlar observed blood in his feces in May 2023, BOP sent him for a colonoscopy in June 2023. Stottlar does not dispute that this colonoscopy and the surgery that followed may have saved his life. The fundamental problem with BOP's handling of Stottlar's medical issues since this colonoscopy is the lack of basic communication and follow-up with him. In light of his father's history, Stottlar has been requesting a consultation with a physician to discuss the apparent decision to wait three years to have his next colonoscopy. Based on the uncontested record of poor communication in this case, Stottlar is minimally entitled to a consultation with the medical professional that made this decision to ensure that professional is fully aware of his unique medical history. For example, it may be standard to recommend a colonoscopy every three

Stottlar has also experienced "lengthy and unexplained delays of needed medical care" for his other conditions, which "[m]any courts have explicitly found . . . can be extraordinary and compelling circumstances." United States v. Burr, No. 1:15-CR-362-1, 2022 WL 17357233, at *6 (M.D.N.C. Dec. 1, 2022). Although Stottlar first began reporting his testicular pain to BOP in July 2023 and BOP has been aware of his testicular cyst since an ultrasound in August 2023, BOP did not arrange for the cyst's removal until December 2025. What is more, although BOP eventually had the cyst surgically removed, the surgical method deployed—open surgery on Stottlar's testicle—materially differed from the minimally invasive, laparoscopic procedure he believed he was receiving and that he consented to. Stottlar has also discovered additional cyst-like nodules on the left side of his scrotum which require an ultrasound—an ultrasound that BOP has failed to provide for over six months.

These issues with Stottlar's testicles are far from the only medical issues BOP has dragged its feet in treating. BOP was aware of Stottlar's hernia no later than December 2023, but failed to arrange for its repair until August 2025. Throughout this time, Stottlar frequently experienced severe testicular and abdominal pain. See United States v. Perez, 451 F. Supp. 3d 288, 293 (S.D.N.Y. 2020) (concluding that defendant's "persistent pain" supported release). Stottlar

---

years after a normal biopsy — but a physician aware of Stottlar's father's history may want to adjust that schedule. Stottlar should not have to wait three years to have a basic conversation about his risk of developing colon cancer in the interim.

14

went without teeth or dentures for the better part of a year, and the dentures ultimately provided do not fit and cause him pain. Although BOP believes that Stottlar's oral pain and the bony fragments he continues to find in his gums are being caused by a benign bone tumor requiring surgery, BOP has yet to arrange for that surgery. Stottlar also continues to experience dizziness when moving from sitting to standing, and there is no evidence BOP is offering Stottlar treatment to address this issue—other than by admonishing him to "brace himself" whenever he stands up.

While BOP is not required to provide an inmate with "the care of [the] inmate's choosing, . . . inmates with health issues are at the BOP's mercy while they are incarcerated, and they cannot independently schedule needed medical tests or care." Burr, 2022 WL 17357233, at *6-7 (quotations and citation omitted). When BOP fails to provide inmates in its care with timely and adequate medical care, extraordinary and compelling reasons for a sentence reduction may exist. Id. at *6. For the reasons discussed above, BOP's inadequate treatment of Stottlar's numerous medical conditions over a prolonged period of time weigh in favor of a sentence reduction.

B.  Stottlar's Rehabilitation is Remarkable

The court next considers Stottlar's contention that a sentence reduction is justified in light of his rehabilitative efforts. As noted, rehabilitation alone cannot constitute an extraordinary and compelling reason for release. 28 U.S.C. § 994(t).

However, rehabilitation may be considered along with other circumstances to conclude that extraordinary and compelling reasons exist.

To call Stottlar's rehabilitation extraordinary would be a profound understatement. His rehabilitation began while he was detained at the Strafford County Department of Corrections ("SCDOC" or "the Department"). While at SCDOC, Stottlar completed the Department's "Therapeutic Communities" ("TC") program. The TC program is a highly reputable substance use disorder treatment program. He was admitted to the program in October 2021 and completed it in January 2022. However, Stottlar's work at the TC program was so outstanding that he was allowed to stay on for more than a year after he completed it. A letter from the TC program, submitted to the court at the time of Stottlar's sentencing in March 2023, detailed his efforts:

> [Jared] has been in TC for over a year and a half and during this incredibly long period of time he has been working diligently on himself and his recovery. Jared still actively participates in every class and group that occurs in the unit. He takes nothing for granted and treats his space in the program as a gift. He shows that gratefulness not only in his commitment to himself but his commitment to the structure and integrity of the program. He has been a support, encouragement, and voice of reason to countless men who have come through TC on their journey. Jared is the person people in the room look to as a role model. For other community members Jared is the person they choose to speak to for guidance and comfort. Teachers marvel over how Jared is still as active and invested as he was in the beginning. It has been our privilege to watch the journey that Jared has been on for himself. The amount of loss he has suffered while in TC has been enormous and yet Jared uses his skills to process and grieve and he continues to

16

move himself into healing.[9] The positive impact that his journey has had on the other individuals that have been fortunate enough to come through TC while Jared has been here is enormous. Our appreciation and gratitude of who he has been and how he has carried himself while in the TC program cannot be [over]stated. Jared has not just talked about change, he has created it for himself. Whether it be in his daily routine, his commitment to recovery and self-love, how he interacts with staff or fellow community members, Jared carries himself with integrity, honesty and positivity. We do not often have the chance to observe a TC [participant's] journey as long as we have been able to watch Jared and what he has been able to create for himself is truly unique.

Doc. no. 116 at 14.

Stottlar's exceptional work with the TC program was in addition to completing substantial educational programming at SCDOC. Indeed, Kasey Dumont, the Department's Director of Programs, was so taken by Stottlar's efforts that she felt compelled to write "the first letter that [she had] ever written" on behalf of an inmate. Id. at 11. Dumont wrote that Stottlar "started participating in programming as soon as we began offering classes" after briefly suspending programming due to COVID-19. Id. She described him as a "model A inmate," who was never in trouble, "always respectful and courteous," and unflinchingly consistent in actively participating in the over fifty classes he attended at SCDOC. Id. Although Stottlar earned many certificates, "it was evident that Mr. Stottlar attended programming to learn how to make changes in his life," not to accumulate

---

[9] Stottlar's father died from cancer in January 2022, while Stottlar was at SCDOC and actively involved in the TC program. His mother died in October or November of 2021, shortly before Stottlar's father learned that his colon cancer had returned.

17

certificates of completion. Id. Stottlar completed this programming before leaving his unit to go to the TC program, which is housed in a separate, segregated area at SCDOC. Before leaving for the TC program, Dumont noted that other inmates on Stottlar's unit would seek him out for advice "if they were having a hard time . . . or feeling stressed out." Id. Stottlar was "missed greatly" on his unit when he left for the TC program. Id.

Before transitioning to the TC program, Stottlar completed twenty-five drug and alcohol classes (receiving a certificate of completion, as only twelve classes are required), twenty-seven "Seeking Safety" classes (receiving a certificate of completion, as only ten classes are required), and all eight classes for the "Breaking Free" program, an online cognitive behavioral program which seeks to assist clients in learning new coping skills in relation to substance use disorder. This programming was in addition to numerous participant-led educational courses that Stottlar completed while at SCDOC—Stottlar completed seventy-eight such courses. See id. at 12-13; doc. no. 116-1 at 1.

Rounding out Stottlar's rehabilitative efforts at SCDOC was his spiritual work with the Department's chaplain, Deacon Arnold Gustafson, who also wrote a letter in Stottlar's support at sentencing. Stottlar began participating in one-on-one spiritual counseling with Gustafson in November 2021, while also participating in his classes in the TC program. Gustafson described Stottlar's entry into the TC program, and the death of both of his parents in late 2021 and early 2022, as turning points in Stottlar's life, and described Stottlar as having dedicated himself

18

wholeheartedly to his recovery from substance use disorder. Like the other character letters from the jail, Gustafson's account of Stottler's rehabilitation stressed his mentorship of other inmates and his compelling leadership abilities.

At his sentencing hearing in March 2023, the court had little doubt that Stottlar's pre-sentencing rehabilitation was genuine. All of the character references and testaments to Stottlar's rehabilitation were borne out by Stottlar's continued efforts after he entered BOP custody. Shortly after arriving at FMC Devens, Stottlar began working as an Inmate Companion on the Memory Disorder Unit. The Memory Disorder Unit offers intensive care to inmates with memory disorders, such as Alzheimer's disease and various types of dementia, as well as inmates with certain psychiatric disorders. These inmates require round-the-clock care. Stottlar testified at the evidentiary hearing on his first compassionate release motion that he essentially performs the role of a Certified Nurse's Assistant—helping inmates clean themselves, addressing their incontinence, helping them shower, changing diapers, and changing bed linens. Stottlar also helps these inmates obtain medication, assists them during mealtimes, and generally works to enable their tasks of day-to-day living. Although Stottlar's shift technically begins at 5:00 in the morning and concludes at 1:30 in the afternoon, he is generally working every moment he is on the unit—which is also where he lives. Stottlar said that, given the nature of the inmates' medical conditions, "they don't remember whether you're on shift or not. They just need help." Doc. no. 167 at 13.

In addition to his work on the Memory Disorder Unit, Stottlar volunteers for the Comfort Care Program at FMC Devens. As a volunteer with this program, Stottlar sits bedside with dying inmates during their final moments. Stottlar has also continued educational programming at FMC Devens, completing courses in drug education and Naloxone training. He has also completed BOP's nonresidential drug abuse program. Finally, he volunteers on the suicide watch team. He has been designated to have the lowest level of recidivism risk.[10]

Stottlar's efforts at FMC Devens have not gone unnoticed by BOP staff. A licensed social worker at FMC Devens writes that Stottlar shows "exceptional" respect to the inmates on the Memory Disorder Unit, and that he "showed dignity and worth for the dying patient that he sat with in their final days doing a volunteer act that not every person would be comfortable doing." Doc. no. 141 at 11. Another BOP staff member said that, in his "extensive dealings with Mr. Stottlar, . . . he has always shown the utmost respect for me and the rest of the inmate population he works with. To say he is an asset to the Memory Disorder Unit would be an understatement." Id. Yet another BOP staff member wrote that Stottlar "always displays kindness and patience towards the inmates residing on the [Memory Disorder Unit], no matter how challenging they are. He offers great

---

[10] Ironically, this would ordinarily qualify Stottlar to be designated for confinement at a federal prison camp, but he cannot be transferred to a camp setting due to a medical hold because of his medical conditions.

insight and [judgment] and has gone above and beyond in terms of caring for all these inmates." Id.

It is not every day that the court sees a defendant so dedicated to rehabilitation. Stottlar has taken advantage of every opportunity presented to him for self-improvement, first by SCDOC, and then by FMC Devens. He did not merely complete the TC program, he excelled in it. He was so dedicated to his recovery and such an asset to the TC community that he was permitted to stay in TC for an additional year-and-a-half after he completed the program. By all accounts, Stottlar's time at SCDOC was unlike anything the staff members there had seen before, to the point where the Director of Programs felt compelled to write a letter on an inmate's behalf for the first time in her career.

It is apparent that Stottlar is not merely "checking the boxes" in his rehabilitation. He is authentic in his desire for self-improvement. That is plain on the face of every letter written on his behalf. But it is also plain from the choices he has made in selecting avenues of rehabilitation. Nothing compelled Stottlar to work on the Memory Disorder Unit—changing diapers and working with one of the most difficult patient populations for someone untrained in the medical field to work with. Stottlar chose that work. He chose to do that difficult work because he wanted to. Similarly, nothing compelled Stottlar to volunteer to sit with dying inmates during their final moments, offering them comfort as they die. Stottlar chose to do that too. Nothing compelled Stottlar to stay with the TC program for more than a year after he completed its offerings. He chose to stay. He could have selected less

arduous options had he wanted to, but he chose the harder path every time. It is obvious that Stottlar is not, as SCDOC's programming director noted, simply accumulating certificates of completion for the sake of accumulating them. His drive to rehabilitate himself is genuine and earnest. Stottlar's rehabilitation weighs heavily in favor of a sentence reduction.

C.    A Sentence Reduction is Consistent with the Policy Statement

The First Circuit has held that district courts should view defendants' reasons for release holistically. See Vega-Figueroa, 139 F.4th at 80-81. Here, Stottlar's complicated medical circumstances, when considered with his profound rehabilitation, paint a picture of a man whose individualized circumstances are "beyond the mine-run" in "fact [and] degree," and which are "both powerful and convincing." Canales-Ramos, 19 F.4th at 566-67. Stottlar has demonstrated extraordinary and compelling reasons for a sentence reduction.

A sentence reduction is consistent with the Sentencing Commission's policy statement on compassionate release. As noted, the policy statement sets forth a non-exclusive list of medical circumstances that may qualify as an extraordinary and compelling reason. Among the enumerated circumstances are those in which BOP's inadequate treatment of a defendant's medical condition "risk[s] . . . serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C). BOP's failures of communication regarding Stottlar's colonoscopies in 2024 and 2025 could have seriously jeopardized Stottlar's health had the polyps discovered during those procedures been cancerous. These failures to timely provide Stottlar with basic

information are particularly concerning in light of Stottlar's father's recurrence and then rapid death from the same cancer. And despite being aware of additional lumps on the left side of Stottlar's scrotum since November 2025, BOP has failed to provide Stottlar with an ultrasound or any meaningful treatment.

The policy statement also provides that extraordinary and compelling reasons exist when the defendant's medical condition "substantially diminishes" the defendant's ability "to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Id. § 1B1.13(b)(1)(B). BOP's failure to treat Stottlar's testicular cyst and hernia for approximately two years caused Stottlar substantial and recurring pain, and frequently interrupted his daily activities by requiring him to go lie down in his cell, reposition the hernia, and wait for the pain to subside. Although BOP eventually repaired the hernia and removed the cyst, Stottlar continues to develop health issues while in BOP custody (such as the new lumps on the left side of his scrotum and the painful bony fragments in his gums), and BOP's failure to timely treat these health issues continues to impact his day-to-day life.

Moreover, even if Stottlar's medical circumstances are not a precise fit with the examples set forth in the policy statement, the policy statement also provides that extraordinary and compelling reasons exist when "[t]he defendant presents any . . . circumstance or combination of circumstances" that are "similar in gravity" to the extraordinary and compelling reasons expressly enumerated in the policy statement. Id. § 1B1.13(b)(5). The First Circuit has recently underscored that

23

district courts are obligated to give serious consideration to a defendant's proffered justification for a sentence reduction even if that justification does not perfectly align with the examples set forth in the policy statement. See Duluc-Méndez, 156 F.4th at 61-62 (holding that district court erred by denying compassionate release motion solely on the ground that the defendant's family circumstances did not fit within examples set forth in the policy statement, but defendant argued that his family circumstances combined with his rehabilitation to justify release). Here, BOP's flawed treatment of Stottlar's complex medical conditions combines with his profound and genuine rehabilitation over the last six years[11] to present a justification for release that is similar in gravity to the medical circumstances enumerated in subsections (b)(1)(B) and (C).

The policy statement also requires that the defendant not be a danger to any other person or the community. U.S.S.G. § 1B1.13(a)(1)(2). For the reasons discussed more fully below in the court's consideration of applicable sentencing factors, Stottlar is not likely to pose a danger to any person or the community. While the court recognizes that Stottlar admitted to being a methamphetamine dealer and to possessing firearms in the course of that activity, Stottlar is not likely

---

[11] Although Stottlar's rehabilitation began prior to his sentencing hearing, the court is permitted to take that portion of his rehabilitation into account here. See U.S.S.G. § 1B1.13(e) ("[A]n extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.").

to recidivate given his remarkable rehabilitation and commitment to addressing the root causes of his unlawful activity.

For these reasons, Stottlar has demonstrated extraordinary and compelling reasons for a sentence reduction, and a sentence reduction would be consistent with the policy statement on compassionate release.

II.     A Sentence Reduction Is Consistent with Applicable Sentencing Factors

The court next considers whether compassionate release is consistent with the applicable § 3553(a) factors. Applicable sentencing factors include the nature and circumstances of Stottlar's offense, his personal history and characteristics, and considerations such as promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public from further crimes, and providing Stottlar with needed care, training, and rehabilitation in the most effective way. See 18 U.S.C. § 3553(a)(1)-(2).

In denying Stottlar's first motion for compassionate release, the court's analysis rested on the serious nature of Stottlar's offenses and the conclusion that releasing him with so much time left to serve on his sentence was not appropriate. Stottlar's offenses are no less serious today than they were when the court denied his first compassionate release motion. At the same time (and as the court also noted in its prior order), other sentencing factors point strongly in favor of release.

For example, as the discussion of Stottlar's rehabilitation demonstrates, his personal history and characteristics strongly support a sentence reduction. Moreover, prior to this case, Stottlar's criminal record was virtually nonexistent. He

had zero criminal history points at the time of sentencing. This is Stottlar's first incarcerative sentence, and given his substantial rehabilitation, it seems likely to be his last. For the same reasons, the goal of public protection weighs in favor of a sentence reduction. BOP itself classifies Stottlar has having the lowest risk to recidivate, and he has strong family and community support.

In addition, BOP is failing to provide Stottlar with adequate care—let alone "the most effective" care. 18 U.S.C. § 3553(a)(2)(D). If released, Stottlar will have access to the healthcare he currently lacks, and will also have access to a wide network of outpatient drug treatment programs, support groups, counseling, vocational training, and the like. Stottlar would also be placed on supervised release, and his probation officer could assist him in obtaining health insurance, locating medical providers, and accessing drug and mental health treatment.

Importantly, after accounting for good time credits, Stottler has served approximately sixty percent of his sentence. Where a defendant establishes extraordinary and compelling reasons for release and he has served approximately half of his sentence, a sentence reduction may be consistent with the goals of adequate deterrence, just punishment, and respect for the law. See United States v. Gil, 484 F. Supp. 3d 19, 25 (D.N.H. 2025).

In sum, applicable sentencing factors tip more favorably in the direction of a sentence reduction than they did at the time of the court's prior order denying relief. And the strength of Stottlar's justification for a sentence reduction has grown since that time as well. Given these developments, Stottlar's extraordinary and

26

compelling reasons for a sentence reduction are no longer outweighed by the applicable sentencing factors, and he has demonstrated entitlement to relief.

## CONCLUSION

Stottlar's renewed motion for compassionate release (doc. no. 174) is granted. Stottlar's sentence is reduced to time-served and he is placed on the four-year term of supervised release set forth in the judgment issued at the time of sentencing (doc. no. 124). Stottlar will be subject to the mandatory, standard, and special conditions of supervision set forth in that judgment. The court will issue an amended criminal judgment.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

June 2, 2026

cc:    Counsel of Record